*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re GRIFFIN, Minors.

UNPUBLISHED
January 11, 2024

No. 366237
St. Clair Circuit Court
Juvenile Division
LC No. 22-000046-NA

In re C. M. GRIFFIN, Minor.

No. 366238
St. Clair Circuit Court
Juvenile Division
LC No. 22-000046-NA

Before: K. F. KELLY, P.J., and JANSEN and HOOD, JJ.

PER CURIAM.

The circuit court terminated respondent-mother's parental rights to her four minor children: ZG, CMG, CJG, and EG, and respondent-father's parental rights to CMG under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist), (g) (failure to provide proper care or custody), and (j) (reasonable likelihood of harm if returned to parent). In these consolidated appeals,[1] respondent-mother and respondent-father challenge the evidentiary support for the court's decision and respondent-father asserts petitioner, the Department of Health and Human Services (DHHS), failed to make reasonable efforts toward reunification. We affirm.

## I. BACKGROUND

Respondents and the children have history with the child protective system. In January 2019, when CMG was only 23 months old, respondent-father was imprisoned for violently assaulting a romantic partner in his home with another child present. Shortly after, the DHHS

---

[1] *In re Griffin Minors*, unpublished order of the Court of Appeals, entered May 31, 2023 (Docket Nos. 366237; 366238).

began providing intensive, in-home services to respondent-mother in an attempt to retain her four children in her care. Even with services in place, respondent-mother had difficulty keeping a roof over her family's head and the condition of her residences was unsanitary. Respondent-mother left CJG alone with an abusive boyfriend, and CJG suffered inexplicable fractures to his arm and leg. She left ZG and CMG alone with her father, who had just been released from prison for criminal sexual conduct, and her father sexually abused CMG. The DHHS took the children into custody in February 2022, when a caseworker found the family living in a trailer without heat.

Respondent-mother and respondent-father entered pleas allowing the court to take jurisdiction over the children. Over the next year, respondent-mother actively participated in intensive, hands-on services to improve her parenting skills. Her two-hour, twice-weekly parenting-time sessions were supervised by a parenting-time supportive worker. Respondent-mother completed parenting classes and regularly attended therapy to work on controlling her moods and emotions. She was consistently employed but had a hard time finding housing because of evictions and a large outstanding debt to DTE. Respondent-mother initially showed improvement, but by December 2022, respondent-mother's performance at parenting time sharply declined. She stopped heeding the supportive supervisor's directions, inconsistently followed through with discipline, and represented as angry and yelling. The children's behavior deteriorated along with their mother's.

Respondent-father was released on parole on May 17, 2022, but was rearrested for committing another violent assault in November 2022. His maximum prison release date is January 31, 2024. During his parole, the DHHS coordinated services with respondent-father's parole officer. However, respondent-father failed to maintain contact with the caseworker or his attorney. He delayed beginning services and accomplished very little before he was reincarcerated. Most importantly, respondent-father declined a parenting class, attended only four or five individual therapy sessions, and had only three supervised, virtual parenting-time sessions with CMG.

Based on respondent-parents' lack of benefit from services, the DHHS changed its goal to termination. In April 2023, the circuit court terminated both parent's rights under MCL 712A.19b(3)(c)(*i*), (g), and (j). Both parents appeal as of right.

## II. REUNIFICATION EFFORTS

Respondent-father contends that the DHHS failed to make statutorily required efforts to reunify him with his child. He focuses solely on the period of his imprisonment, but looking to the proceedings as a whole, we discern no breach of duty.

We review for clear err a trial court's factual findings regarding the DHHS's reunification efforts. *In re Atchley*, 341 Mich App 332, 338; 990 NW2d 685 (2022). "A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). We review de novo underlying questions of statutory interpretation. *In re AGD*, 327 Mich App 332, 338; 933 NW2d 751 (2019). The Legislature's intent is determined from the plain language of the statute, which must be applied as written. *Id*. at 343.

" 'Reasonable efforts to reunify the child and family must be made in *all* cases' except those involving aggravated circumstances. . . ." *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010), quoting MCL 712A.19a(2) (emphasis in *Mason*).

> As part of these reasonable efforts, the [DHHS] must create a service plan outlining the steps that both it and the parent will take to rectify the issues that led to court involvement and to achieve reunification. MCL 712A.18f(3)(d) (stating that the service plan shall include a "[s]chedule of services to be provided to the parent . . . to facilitate the child's return to his or her home"). [*In re Hicks/Brown*, 500 Mich 79, 85-86; 893 NW2d 637 (2017) (second alteration in original).]

"The state is not relieved of its duties to engage an absent parent merely because that parent is incarcerated." *In re Mason*, 486 Mich at 152. MCL 712A.19a(2) more specifically states: "Reasonable efforts to reunify the child and family must be made in all cases except" under limited circumstances, which all involve extreme physical harm caused to another child or the involuntarily termination of the parent's rights to another child. These "aggravated circumstances" are also encompassed in MCL 722.638.

No aggravated circumstance existed in this case to excuse the DHHS's duty to make reasonable efforts toward reunification. No one has alleged that respondent-father abused any child. Although the record is less than clear, it appears that respondent-father's 2019 conviction was based on assault of a romantic partner in the living room of his home. His two-year-old son from another relationship was in the home and walked in during the assault. Witnessing domestic violence is not an aggravated circumstance. Absent aggravated circumstances as defined in the statutes, the DHHS was required to provide services toward reunification.

Contrary to respondent-father's challenge, reasonable efforts were made. "While the [DHHS] has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of respondents to participate in[, and demonstrate benefit from,] the services that are offered." *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). Ultimately, challenges to the adequacy of reunification efforts "bear on whether there is sufficient evidence to terminate a parent's rights." *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.).

The court took jurisdiction over CMG in relation to respondent-father on May 23, 2022, while respondent-father was on parole. The case service plan listed the services required as a condition of respondent-father's parole and indicated that they met the needs of the child protective proceeding. This included a psychological evaluation, therapy, sex offender programming, drug screens, and a substance abuse assessment. Respondent-father did not maintain contact with the caseworker or his attorney. Once he did reach out, the caseworker arranged supervised virtual visits, but respondent-father participated in only three.

Respondent-father submitted to a psychological evaluation, but did not provide the report to the caseworker until much later. He did not follow through with required therapy until October 2022, and missed approximately half of his scheduled appointments. The DHHS referred respondent-father for parenting classes, but he declined to start those classes until he secured

independent housing. Respondent-father's August 24, 2022 substance abuse assessment went well and no further services were ordered.

The caseworker scheduled virtual parenting time beginning in late August 2022, through November 2022. Respondent-father attended three sessions in August 2022, and then claimed he could not attend because of his work schedule. Respondent-father claimed he quit his job because it interfered with parenting time, but he did not attend any further scheduled visits. Respondent-father claims the caseworker said he had to be employed to attend virtual visits, but there is no such requirement found in the record.

Respondent-father waited until he was back in prison to complain that the caseworker failed to reach out to him to provide services and parenting time. He waited until the termination hearing to claim the caseworker would not allow him to attend virtual parenting time while he was unemployed. The record supports respondent-father's claim that no further services were offered by the DHHS once respondent-father returned to prison. The caseworker encouraged respondent-father to participate in services available to him within the prison and respondent-father did so.

The DHHS made reasonable efforts to reunite respondent-father with CMG. The DHHS coordinated services with respondent-father's parole officer and offered additional services as well. Respondent-father failed to keep in contact with the caseworker and as a result, did not understand what was required of him. This does not negate that reasonable efforts were made and services were offered. Respondent-father did not meet his commensurate duty to participate in and benefit from services. See *In re Frey*, 297 Mich App at 248.

## III. STATUTORY GROUNDS

Both parents contend that the record evidence did not support the statutory grounds cited for termination. We review for clear error a lower court's factual finding that a statutory ground for termination has been established. *In re Rood*, 483 Mich at 90-91 (opinion by CORRIGAN, J.). "A finding is clearly erroneous if although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *In re Mason*, 486 Mich at 152 (quotation marks, citation, and alteration omitted).

Under MCL 712A.19b(3), a circuit court "may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence" at least *one* statutory ground has been proven by the DHHS. *In re Trejo*, 462 Mich 341, 350; 612 NW2d 407 (2000). The court's termination decision followed the filing of a supplemental petition. When termination is sought in a supplemental petition based on new grounds, the DHHS must present legally admissible evidence in support. *In re DMK*, 289 Mich App 246, 258; 796 NW2d 129 (2010).

The court terminated respondent-mother's and respondent-father's parental rights under MCL 712A.19b(3)(c)(*i*), (g), and (j), which state:

> (3) The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:

> \* \* \*

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

* * *

(g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

* * *

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

Termination of respondent-mother's parental rights was supported under factors (c)(*i*) and (g). The conditions existing when the court took jurisdiction—a lack of housing and parenting skills—continued to exist well beyond 182 days and given these circumstances, respondent-mother could not provide proper care and custody for her children.

Respondent-mother did not secure housing until January 2023, and did not move in until March 1, 2023. Respondent-mother presented two rent receipts at the termination hearing and had already been a week late on one payment. Respondent-mother testified she would have to reduce her work hours when the children were returned to her care. Accordingly, this housing situation was not financially sustainable. Respondent-mother also kept her home in unsanitary, unsafe conditions in the past. Given the brief period of her residence, respondent-mother could not demonstrate an ability to maintain a safe, sanitary home.

More importantly, respondent-mother's parenting skills still precluded unsupervised parenting time. Respondent-mother received intensive, in-home services from October 2019, through at least June 2021, to address her parenting skills. From February 2022 through April 2023, respondent-mother participated in parenting time for two hours twice a week. These visits were supervised by a supportive services worker who provided intensive, hands-on training. Despite these intensive services, respondent-mother still could not manage and supervise her four children.

Sue Nieghorn said that respondent-mother's visits were initially chaotic and she had safety concerns. In the summer of 2022, things improved. Respondent-mother was receptive to advice and was appropriate with the children. Things started to decline again in the fall. Respondent-mother became less accepting of Nieghorn's advice. Respondent-mother did not make the children follow her directions. She became angrier and often yelled at the children. Respondent-mother yelled at the foster parents on two occasions in front of the children.

On December 22, 2022, respondent-mother arrived late to a visit for the first time. She learned CJG's father accused her of harassing him. She was angry CJG was not there when she first arrived; the child had a bathroom accident and his father took him home to change. Respondent-mother confronted the child's father at drop-off. While feeding CJG, respondent-mother interrogated him about his absence and the child became uncomfortable. After being asked to stop and warned the visit would be ended prematurely, respondent-mother stormed out and took the bags of Christmas presents she had brought for the children. This devastated the young children and they started to cry. Respondent-mother eventually threw the bags into the room and left. Throughout this exchange, respondent-mother yelled and used profanity. Respondent-mother continued to be angry and to yell at the children throughout January, February, and into March 2023. During this time, the children's bad behavior increased and respondent-mother stopped following through with timeouts and instructing the children to clean up after themselves. Only in the couple of weeks before the termination hearing did respondent-mother's attitude change.

Respondent-mother worked very hard to try and overcome the conditions preventing her from providing proper care and custody for her children. She was employed throughout the proceedings, attended parenting classes, and regularly attended counseling after her psychological evaluation. Yet, respondent-mother was unable to secure housing until it was so late in the proceedings that she could not demonstrate sustainability. Despite months of counseling, respondent-mother could not control her anger and emotions. Most importantly, for several months and until the last couple of weeks before the termination hearing, respondent-mother had a series of parenting-time sessions where she could not control the children and only intensified their bad behavior. Ultimately, respondent-mother did not demonstrate consistent benefit from the several years of intensive parenting-assistance services. She did not rectify this significant barrier to reunification. Because respondent-mother demonstrated so little benefit after so many years, there was no reasonable likelihood that she could remedy her parenting skills in a reasonable time given the children's ages and provide proper care and custody. Accordingly, termination was supported under factors (c)(*i*) and (g).[2]

Termination of respondent-father's parental rights to CMG was similarly supported under factors (c)(*i*) and (g). The only ground alleged against respondent-father in taking jurisdiction was his incarceration for a violent offense, leaving him unable to care for CMG. By the time of the termination hearing, respondent-father had violated his parole by committing another violent offense and was reincarcerated.

"[A] parent's failure to comply with the parent-agency agreement is evidence of a parent's failure to provide proper care and custody for the child." *In re JK*, 468 Mich 202, 214; 661 NW2d 216 (2003). Failure to comply also prevents a parent from rectifying the conditions leading to adjudication. Respondent-father was released on parole from May 17, 2022, through November 17, 2022. The caseworker reached out to respondent-father, but he did not respond until late July 2022. Respondent-father did not appear for meetings and even some court hearings,

---

[2] In affirming termination under factor (g), we do not rely on respondent-mother's financial insecurity. We rely on her inability to provide proper care and custody given her lack of benefit from services addressing her parenting skills.

and did not maintain contact with his attorney. Respondent-father submitted to a substance abuse assessment and psychological evaluation. However, he waited more than two months after his psychological evaluation to start individual therapy and missed half of his scheduled appointments. The DHHS referred respondent-father for parenting classes, but he elected not to start that service. Respondent-father participated in sexual offender programming, but returned to prison before he finished. The caseworker scheduled frequent virtual visits for respondent-father and CMG from August 2022 through November 2022, but respondent-father attended only three sessions. Respondent-father shifted the blame onto his caseworker, but the record shows respondent-father stopped contacting the caseworker in the fall of 2022.

As a result of respondent's lackluster participation in services and visits, respondent-father has no bond with his child. Respondent-father did nothing to demonstrate an ability to safely care for his child. And, respondent-father committed another violent act leading to his reincarceration and continued inability to take custody of his child. The record evidence supports the court's conclusion that termination was supported under factors (c)(*i*) and (g).[3]

## IV. BEST INTERESTS

Respondents lastly contend termination of their parental rights was not in the best interests of their children. We review for clear error the trial court's determination that termination of parental rights is in a child's best interest. *In re Jones*, 286 Mich App 126, 129; 777 NW2d 728 (2009).

"Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012), citing MCL 712A.19b(5) and MCR 3.977(E)(4). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The decision must be based on evidence gleaned from the whole record. *In re Brown/Kindle/Muhammad*, 305 Mich App 623, 637; 853 NW2d 459 (2014). Relevant factors include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App at 41-42 (citations omitted). "The trial court may also consider a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *In re White*, 303 Mich App 701, 714; 846 NW2d 61 (2014). "Other considerations include the length of time the child was in care [and] the likelihood that the child could be returned to her parents' home within the foreseeable future, if at all. . . ." *In re Payne/Pumphrey/Fortson*, 311 Mich App 49, 64; 874 NW2d 205 (2015) (quotation marks and citation omitted). "With respect to the trial court's best-interests determination, we place our focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016).

---

[3] As the court need find only one statutory ground to support termination, we need not consider the propriety of termination under factor (j) for either parent. See *In re Trejo*, 462 Mich at 350.

The record establishes respondent-mother and her four children have a strong bond and love each other. While respondent-mother stopped participating in services before her children were taken into care, she completed every service offered since the court took jurisdiction. While it is a sad outcome, termination of respondent-mother's parental rights is still in the children's best interests.

The DHHS provided services to respondent-mother from October 2019, through April 2023. She has been given intensive, hands-on services to improve her parenting skills, completed parenting classes, and regularly participated in therapy. Yet, respondent-mother has not benefited. As late as March 2023, respondent-mother represented as angry during parenting times, yelled at the children, and exacerbated their negative behaviors. She admittedly did not follow through with consequences and disregarded the advice of the parenting-time supervisor.

The December 22, 2022 visit was the worst example. On what should have been a joyous Christmas visit, respondent-mother started an argument with CJG's father, interrogated CJG about his need to go home and change after a bathroom accident (making the child visibly upset), and shouted profanities at Nieghorn. Respondent-mother withheld the children's Christmas presents and then threw them in the room, storming off while the children sobbed. The children need stability and security. Respondent-mother's wild and volatile mood swings provide anything but. Given the length of time services have already been provided, there is no guarantee that respondent-mother will be able to regulate her moods and safely care for the children in the near future. The children cannot wait indefinitely. Therefore, termination of respondent-mother's parental rights was in the children's best interests.

Respondent-father was incarcerated in January 2019, when CMG was 23 months old. He has not seen his child in person since that date. He had only three virtual visits with CMG since that time. As a result, respondent-father and CMG have no bond. Therapeutic parenting time would have to occur before CMG could be placed in her father's care, and this would take significant time. However, respondent-father will be imprisoned until January 31, 2024. He cannot start intensive reunification services until that time because there are not enough services available in prison. Respondent-father demonstrated from May 17, 2022, through November 17, 2022, that he was not inclined to maintain contact with his caseworker or follow through with necessary services in a timely manner, if at all. If history repeats itself, respondent-father would never be able to take custody of his child.

CMG has behavioral issues and takes psychotropic medications for attention deficit hyperactivity disorder. She is prone to melting down and is easily agitated. The uncertainty and instability caused by the adults in her life has been especially detrimental for her. CMG requires a permanent home where she can receive the assistance and guidance she needs to overcome her challenges. She cannot wait indefinitely for respondent-father to demonstrate benefit from services. As such, termination of respondent-father's parental rights was in CMG's best interests.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Kathleen Jansen
/s/ Noah P. Hood

-8-